## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| DeERIC M. STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  15-cv-2177 |
| | ) | |
| v. | ) | Judge Sue E. Myerscough |
| | ) | Magistrate Judge Tom Schanzle-Haskins |
| TIMOTHY F. BUKOWSKI, et al., | ) | |
| | ) | **JURY DEMAND** |
| Defendants. | ) | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### AND MEMORANDUM IN SUPPORT

NOW COME Defendants, SHERIFF TIMOTHY BUKOWSKI, CHIEF OF

CORRECTIONS MICHAEL DOWNEY, SERGEANTS TODD SCHLOENDORF and

RICHARD BALL, and CORRECTIONAL OFFICERS ZACHARY TUTT, TRAVIS MOLIGA,

and BENJAMIN GARCIA, by and through their attorneys, MICHAEL W. CONDON and

ANTHONY G. BECKNEK of HERVAS, CONDON & BERSANI, P.C., and pursuant to Federal

Rule of Civil Procedure 56 and Central District of Illinois Local Rule 7.1(D), move this

Honorable Court for an Order granting summary judgment in their favor.

### INTRODUCTION

Plaintiff has filed a Complaint pursuant to 42 U.S.C. § 1983 against Defendants Sheriff

Timothy Bukowski, Chief of Corrections Michael Downey, Sergeants Richard Ball and Todd

Schloendorf, and Correctional Officers Zachary Tutt, Travis Moliga, and Benjamin Garcia.

Plaintiff alleges that Defendants Bukowski and Downey failed to protect him during an

altercation with another inmate while Plaintiff was a detainee at the Jerome Combs Detention

Center ("JCDC") in Kankakee, Illinois.  Plaintiff further alleges that the remaining sergeants and

correctional officer Defendants were deliberately indifferent to his serious medical needs in that they delayed him medical attention for an hour. Defendants now move for summary judgment and submit this memorandum in support of their motion.

**UNDISPUTED MATERIAL FACTS**[1]

**I.      Parties and Claims**

1)      On June 4, 2013, Plaintiff was arrested on federal charges of possession of firearms, conspiracy to commit robbery, and conspiracy to distribute more than 10 kilograms of cocaine (Plaintiff's Deposition, p. 9; Plaintiff's Deposition Exhibits 1-8; attached hereto as Exhibit A).

2)      On December 26, 2013, the date of this incident, Plaintiff was a detainee at the Jerome Combs Detention Center in Kankakee, Illinois (Ex. A, Pl.'s Dep. Ex. 8, Defs.' Answer).

3)      On December 26, 2013, Defendant Timothy Bukowski was the Sheriff of Kankakee County, Defendant Michael Downey was the Chief of Corrections, Defendants Todd Schloendorf and Richard Ball were Sergeants, and Defendants Zachary Tutt, Travis Moliga, and Benjamin Garcia were Correctional Officers (Ex. A, Pl.'s Dep. Ex. 8, Defs.' Answer, ¶¶ 6-7).

4)      Plaintiff has two claims in this suit: (1) failure to protect against Defendants Bukowski and Downey; and (2) deliberate indifference to his serious medical needs against Defendants Sergeant Todd Schloendorf, Sergeant Richard Ball, and Correctional Officers Zachary Tutt, Travis Moliga, and Ben Garcia (Ex. A, Pl.'s Dep., pp. 24-26).

---

[1]      For purposes of this motion only, Defendants will treat the statements made by Plaintiff at his deposition as constituting undisputed material facts.

**II.    December 26, 2013, Incident**

5)    On December 26, 2013, at or around 5:35 a.m., Plaintiff was involved in a fight in housing pod Max-A (Ex. A, Pl.'s Dep., pp. 48-49; Pl.'s Dep. Ex. 5, Pass-On Book dated 12/16/2013).

6)    On December 26, 2013, around 5:30 a.m., Plaintiff came out of his bottom tier cell in Max-A and dropped off his food bowl to the officers' desk (Ex. A, Pl.'s Dep., p. 51).

7)    Plaintiff returned to his cell, but then immediately opened his cell door and left his cell to allegedly pick up a magazine from the cell of another inmate (Ex. A, Pl.'s Dep., pp. 51-56).

8)    Upon leaving his cell, Plaintiff began speaking with inmate Malcolm Johnson, who was coming down the stairs from his top-tier cell; inmate Johnson began saying derogatory remarks towards Plaintiff and indicating to Plaintiff that he wanted to fight (Ex. A, Pl.'s Dep., pp. 49-52).

9)    On the JCDC's Max-A Pod security video, at approximately 5:38:42 a.m., inmate Johnson appears on the screen on the top tier of the housing pod and is starting his dissent down the stairs; Plaintiff is located in cell 2 on the bottom tier under the stairs (Ex. A, Pl.'s Dep., pp. 135-136; Pl.'s Dep., Ex. 6, JCDC Security Video, 5:38:42-5:38:48, bates stamped JCDC 000553).

10)    Plaintiff exits his cell at approximately 5:38:48 a.m. on the security camera video (Ex. A, Pl.'s Dep., p. 136; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:38:48, bates stamped JCDC 000553).

11)     Plaintiff admitted that he was not backing down from inmate Johnson, exchanged derogatory words with inmate Johnson, and then engaged him in a fight (Ex. A, Pl.'s Dep., pp. 51-56, 79-80).

12)     Plaintiff informed inmate Johnson that he was not going anywhere and that inmate Johnson was not going to threaten him; Plaintiff admitted that he contemplated going back into his cell, but he stated he would look like a coward for doing so and would show weakness (Ex. A, Pl.'s Dep., pp. 57-60).

13)     Outside the view of the security camera at approximately 5:38:50 to 5:39:05, inmate Malcolm Johnson and Plaintiff exchanged words with each other before squaring up to fight (Ex. A, Pl.'s Dep., p. 136; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:38:50-5:39:05, bates stamped JCDC 000553).

14)     At approximately 5:39:05 on the security camera, Plaintiff and inmate Johnson appear on the security camera and begin a physical altercation (Ex. A, Pl.'s Dep., p. 137; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:39:05, bates stamped JCDC 000553).

15)     Plaintiff admitted to voluntarily coming out of his cell and engaging in confrontational words and eventually a fight with inmate Johnson ((Ex. A, Pl.'s Dep., pp. 59-62, 169-171).

16)     Plaintiff pled guilty to a JCDC violation, 2.29, engaging in a fight, and received 15 days in segregation as discipline (Ex. A, Pl.'s Dep., pp. 60-62, 130-131; Pl.'s Dep. Ex. 5, Incident Report, Violation Discipline dated 01/03/2014, bates stamped JCDC 000374).

17)     Plaintiff had no previous communication with inmate Johnson and did not know him (Ex. A, Pl.'s Dep., pp. 52-53).

18) Plaintiff had no prior disagreements or arguments with inmate Johnson; nor did Plaintiff write any grievances that he feared inmate Johnson or anyone in the pod (Ex. A, Pl.'s Dep., pp. 54-55).

19) Plaintiff did not inform anyone at JCDC that he was afraid of anybody from the jail, or that he believed he would be engaged in a fight (Ex. A, Pl.'s Dep., pp. 57, 38-39).

20) Plaintiff did not inform any correctional officers or draft any grievances indicating that he feared for his safety because he "wasn't aware that the assault was going to occur" (Ex. A, Pl.'s Dep., pp. 38-39, 97-99).

21) On December 26, 2013, during the midnight shift, Officer Tutt was assigned to Max-Pod, Officer Garcia was assigned to E-Pod, Officer Moliga was assigned to the rover position, and Sgt. Ball was assigned to booking (Ex. A, Pl.'s Dep., pp. 99-100; Pl.'s Dep. Ex. 5, Midnight-Shift Intake Blotter, dated 12/26/2013, bates stamped JCDC 000246).

22) The officers in booking are in charge of booking prisoners into and out of the facility, as well as transporting inmates outside of the facility; the officers assigned to the rover position are responsible for transporting inmates and moving to different Pods within the facility that need help with different inmate situations, such as altercations (Downey Affidavit ¶ 7, attached hereto as Exhibit B).

23) The officers who are assigned to specific housing units, such as E-POD or Max-A, are responsible for supervising the inmates within their Pods and conducting security checks within the housing Pods (Ex. B, Downey Aff.¶ 7).

24) The proper and appropriate response to an inmate altercation is determined by the factual circumstances of the incident; however, "10/10" is immediately called over the radio

signaling a fight in progress and back-up officers are called to respond to the altercation (Ex. B, Downey Aff., ¶ 9).

25) It is JCDC policy that if there is an inmate altercation, correctional officers must wait for back-up officers to outnumber the inmates involved in the altercation before using physical tactics to interject themselves into the altercation, and preferably must wait for a Taser if one is available in order to protect the officers, inmates, and the institution (Ex. B, Downey Aff., ¶ 10).

26) Officers are trained to provide verbal commands before attempting to physically restrain inmates involved in an altercation (Ex. B, Downey Aff., ¶ 11).

27) Tasers are kept within the booking department for the safety of the staff, inmates, and institution in order to insure they never fall into an inmate's possession; JCDC has several Tasers that are within the booking department for situations requiring the legal use of force (Ex. B, Downey Aff., ¶ 12).

28) Plaintiff admitted that Correctional Officer Tutt called "10-10" over the radio, indicating a fight in progress; Officer Tutt and Officer Moliga were at the officers' desk of the housing pod outside of Max-A at the start of the altercation as they were serving breakfast to the Max inmates (Ex. A, Pl.'s Dep., pp. 76-78; Pl.'s Dep. Ex. 5, Incident Report dated 12/26/2013, bates stamped JCDC 000015).

29) Plaintiff admitted that he is unaware of what each individual Defendant was doing at the exact moment that "10-10" was called over the radio, or their location within the facility (Ex. A, Pl.'s Dep., p. 101).

30) Plaintiff is wearing a white rag on his head during the fight, which continues between Plaintiff and inmate Johnson through 5:39:54 on the security camera video (Ex. A, Pl.'s

Dep., pp. 137-140; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:39:05-5:39:54, bates stamped JCDC 000553).

31)     During the altercation between inmate Johnson and Plaintiff, a third inmate, Demetrius Moore, joined the altercation and struck Plaintiff in the face (Ex. A, Pl.'s Dep., pp. 59-60).

32)     Officer Tutt informed the housing unit to lock down, but noticed that inmate Moore's cell door was open; Officer Tutt got on the intercom and informed inmate Moore to shut his door and for the other inmates in the pod to stay in their cells, but Moore refused and instead walked down the stairs toward the altercation between inmate Johnson and Plaintiff (Ex. A, Pl.'s Dep. Ex. 5, Incident Report, dated 12/26/2013, bates stamped JCDC 000015).

33)     At approximately 5:39:48 on the security camera footage, inmate Moore walks down the stairs of the Max-A housing pod toward the altercation (Ex. A, Pl.'s Dep., p. 139; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:39:48, bates stamped JCDC 000553).

34)     At approximately 5:39:55 on the security camera footage, inmate Johnson disengages from fighting Plaintiff (Ex. A, Pl.'s Dep., pp. 140-141; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:39:55, bates stamped JCDC 000553).

35)     Just two seconds later, at approximately 5:39:57 on the security video, inmate Moore attacks Plaintiff (Ex. A, Pl.'s Dep., pp. 139-141; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:39:57, bates stamped JCDC 000553).

36)     Plaintiff indicated that he stopped fighting with inmate Johnson for a matter of seconds prior to inmate Moore striking him in the face (Ex. A, Pl.'s Dep., pp. 81-83).

37)     Inmates Johnson and Moore then both attacked Plaintiff and struck him several times in the shower area of the housing pod (Ex. A, Pl.'s Dep., pp. 83-85; Pl.'s Dep. Ex. 5, Incident Report dated 12/26/2013, bates stamped JCDC 000015).

38)     At approximately 5:40:01, the three inmates move towards the shower area and are behind the stairs within the Max-A pod and are not visible to the camera; Plaintiff alleges that at this time, he is being assaulted by inmates Moore and Johnson (Ex. A, Pl.'s Dep., pp. 141-142; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:40:01, bates stamped JCDC 000553).

39)     Officer Garcia responded to the "10-10" fight in progress and immediately responded to the Max housing pod by running to the unit and entering the pod (Ex. A, Pl.'s Dep., pp. 86-90; Pl.'s Dep. Ex. 5, Incident Report dated 12/26/2013, bates JCDC 000015-16).

40)     Upon Officer Garcia's arrival to Max, Officers Garcia, Tutt, and Moliga observed the fight between Plaintiff and inmates Johnson and Moore, and decided to physically intervene in the altercation for the safety of the detainees involved and because a Taser was not immediately available from booking (Ex. A, Pl.'s Dep. Ex. 5, Incident Report, dated 12/26/2013, JCDC 000015-16).

41)     Officers Moliga, Garcia, and Tutt entered the pod nearly a minute after the fight began and started yelling orders at all three inmates to get on the ground and cuff up, to which the three inmates complied (Ex. A, Pl.'s Dep., pp. 85-87; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:40:20, bates stamped JCDC 000553).

42)     At approximately 5:40:17 on the security camera video, inmate Johnson moves away from the altercation, followed shortly thereafter by inmate Moore as the officers enter the pod (Ex. A, Pl.'s Dep., pp. 142-143; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:40:17, bates stamped JCDC 000553).

43) The three officers physically restrained the inmates and brought them to the ground with minimum force necessary to gain compliance (Ex. A, Pl.'s Dep., pp. 90-91; Pl.'s Dep. Ex. 5, Incident Report dated 12/26/2013, bates stamped JCDC 000016).

44) Plaintiff admitted that the altercation between himself and inmates Moore and Johnson lasted approximately one minute and 15 seconds before the officers physically intervened; the officers appear on the camera at approximately 5:40:20 (Ex. A, Pl.'s Dep., pp. 142-143; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:39:05-5:40:20, bates stamped JCDC 000553).

45) Plaintiff was aware of the JCDC policy that officers must wait for back-up officers prior to intervening in a fight (Ex. A, Pl.'s Dep., pp. 91-92).

46) At approximately 5:40:35 on the security camera video, all three inmates were being detained and handcuffed by the officers (pp. 143-144; Ex. 6, JCDC Security Video, 5:40:35, bates stamped JCDC 000553).

47) Sgt. Richard Ball arrived in Max Pod at approximately 5:41:50 on the security camera with a yellow Taser; Sgt. Ball saw multiple inmates secured in handcuffs on the floor and ordered the inmates be transported into different housing units and cells pursuant to JCDC policy (Ex. B, Downey Aff., ¶ 13; Pl.'s Dep. Ex. 5, Incident Report, dated 12/26/2013, bates stamped JCDC 000373; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:40:35, bates stamped JCDC 000553).

48) The policy and procedure of the JCDC is to separate individuals that have been involved in an altercation and move them to different cells and housing Pods (Ex. A, Pl.'s Dep., pp. 64-65; Ex. B, Downey Aff., ¶ 13).

49)     At approximately 5:46:44 on the security camera video, Plaintiff is lifted to his feet by two officers and is removed from Max-A and transported to the Max-C housing unit (Ex. A, Pl.'s Dep., pp. 144-145; Pl.'s Dep. Ex. 6, JCDC Security Video, 5:46:44, JCDC 000553).

50)     Plaintiff was moved to Max-C after the altercation at approximately 6:00 a.m., while inmates Johnson and Moore were transferred to Max-B (Ex. A, Pl.'s Dep., p. 63; Pl.'s Dep. Ex. 5, Pass-On Book dated 12/16/2013).

51)     The pass-on book from Max housing pod on December 26, 2013, indicates that Plaintiff asked for medical attention at 6:50 a.m. (Ex. A, Pl.'s Dep., pp. 65-66; Pl.'s Dep. Ex. 5, Pass-On Book dated 12/16/2013).

52)     The pass-on book is a document used by correctional officers at the JCDC to document events that take place within the housing pod, such as an altercation or an inmate being transferred; correctional officers are trained to document events in the pass-on book as soon as possible to dictate an event around the time of its occurrence, however, the times within the pass-on book are approximate and may of course be minutes after an event has taken place (Ex. B, Downey Aff., ¶ 14).

53)     Officer Moliga's statement indicates that while being transported to Max-C, Plaintiff was bleeding from his face and stated that he could not feel his jaw, but Plaintiff was not sure if he needed medical attention; Plaintiff admitted that Officer Moliga's statement is accurate, but that he recalls asking to see a doctor shortly after the incident (Ex. A, Pl.'s Dep., pp. 93-95; Pl.'s Dep. Ex. 5, Incident Report dated 12/26/2013, bates stamped JCDC 000016).

54)     Plaintiff cannot recall who he asked for medical attention while being transported to Max-C, but believes it would have been Officers Garcia and Moliga as they transferred him immediately after the altercation (Ex. A, Pl.'s Dep., pp. 66-67, 94-95).

55)    Plaintiff admits he did not inform Sgt. Schloendorf, Sgt. Ball, or Officer Tutt that he needed medical attention (Ex. A, Pl.'s Dep., pp. 94-95).

56)    Plaintiff alleges that he continued to ask for medical attention while in his cell in Max-C by pressing the intercom buzzer within his cell (Ex. A, Pl.'s Dep., pp. 69-70).

57)    At 7:00 a.m., Plaintiff was first responded by Correctional Officer Manuel Villafuerte; the pass-on book from Max housing pod indicates that Plaintiff was seen by Officer Villafuerte at 7:00 a.m. (Ex. A, Pl.'s Dep., pp. 70-71; Pl.'s Dep. Ex. 5, Pass-On Book dated 12/16/2013).

58)    First responders are members of the correctional staff who are medically trained to treat and assess an inmate and decide whether the inmate needs immediate emergency medical attention, or whether the inmate can see a nurse or physician assistant upon the medical staff coming on duty (Ex. B, Downey Aff., ¶ 15).

59)    Plaintiff understood that a first responder comes to see an inmate after an incident to determine whether they are in need of further medical treatment (Ex. A, Pl.'s Dep., p. 30).

60)    Plaintiff cannot recall one way or another whether Officer Villafuerte asked him whether he needed medical attention, but indicated that Officer Villafuerte saw Plaintiff's injuries and informed him he was going to get a nurse (Ex. A, Pl.'s Dep., pp. 68-69, 30-33).

61)    Shortly after Officer Villafuerte left, Nurse Charee Sangster came and evaluated Plaintiff; Nurse Sangster informed the correctional staff that Plaintiff needed to be taken to the hospital (Ex. A, Pl.'s Dep., pp. 70-71, 115-116; Pl.'s Dep. Ex. 5, Nursing Note, dated 12/16/2013, JCDC 000320).

62)    Nurse Sangster indicated in a nursing note that she saw Plaintiff after he was involved in an altercation, and that she noted swelling to his left jaw and that he was unable to

close his mouth; Nurse Sangster sent Plaintiff to Presence St. Mary's Hospital Emergency Room (Ex. A, Pl.'s Dep., pp. 115-116; Pl.'s Dep. Ex. 5, Nursing Note, dated 12/26/2013, JCDC 000320).

63)     The pass-on book from Max housing pod on December 26, 2013, indicates that Plaintiff was seen by Nurse Sangster at 7:10 a.m., and sent to the hospital at approximately 8 a.m. (Ex. A, Pl.'s Dep., pp. 70-72; Pl.'s Dep. Ex. 5, Pass-On Book dated 12/16/2013).

64)     The Presence St. Mary's Hospital Emergency Services Intake Form indicates at the top right corner that Plaintiff arrived at the emergency room at approximately 7:52 a.m. (Ex. A, Pl.'s Dep., p. 71-73; Pl.'s Dep. Ex. 5, Presence St. Mary's Hospital Intake, dated 12/26/2013, bates stamped JCDC 000283).

65)     At approximately 9:00 a.m., Plaintiff had a CT brain scan at Presence St. Mary's Hospital (Ex. A, Pl.'s Dep., p. 76; Pl.'s Dep. Ex. 5, Presence St. Mary's Hospital Intake, dated 12/26/2013, bates stamped JCDC 000283).

66)     At 10:23 a.m., Plaintiff was admitted from the emergency room to Presence St. Mary's Hospital (Ex. A, Pl.'s Dep., pp. 76-77; Pl.'s Dep. Ex. 5, Presence St. Mary's Hospital Intake, dated 12/26/2013, bates stamped JCDC 000283).

67)     Plaintiff admitted that once he got to the hospital, he began receiving pain medication and was being seen and treated by medical personnel, including receiving an x-ray of his mandible and a brain scan (Ex. A, Pl.'s Dep., p. 111).

68)     Plaintiff suffered a left mandible angle fracture, as well as a right mandible parasymphis fracture as a result of his altercation with inmates Johnson and Moore; Plaintiff underwent surgery on December 27, 2013, to correct both injuries (Ex. A, Pl.'s Dep., pp. 104-

106; Pl.'s Dep. Ex. 5, Presence St. Mary's Report of Operation, dated 12/27/2013, JCDC 000287).

69)     Plaintiff is suing the Sergeants and Correctional Officer Defendants because allegedly they escorted Plaintiff or witnessed Plaintiff being escorted after the altercation to a segregation cell instead of immediately providing Plaintiff medical attention by taking him to the hospital (Ex. A, Pl.'s Dep., p. 34-35, 37, 167-168; Pl.'s Dep., Ex. 1, Pl.'s Interrogs., ¶ 14).

70)     Plaintiff admitted that none of the correctional officer Defendants are medical personnel (Ex. A, Pl.'s Dep., p. 35).

71)     Plaintiff sued the five correctional officers for deliberate indifference for what he alleges is a two hour delay between the altercation and getting medical treatment at the hospital (Ex. A, Pl.'s Dep., pp. 112-113).

**III.     Failure to Protect Claim Allegations**

72)     On December 18, 2013, Officer Tutt found a shank in the shower area of Max-A pod (Ex. A, Pl.'s Dep., pp. 131-133; Pl.'s Dep. Ex. 5, Incident Report, dated 12/18/2013, bates stamped JCDC 000387).

73)     Pursuant to the finding of the shank, Max-A pod was placed on lockdown on December 18, 2013, and through December 26, 2013 (Ex. A, Pl.'s Dep., p. 133; Ex. B, Downey Aff., ¶ 5).

74)     A lockdown is a correctional mechanism in which inmates are only let out of their cells for very limited hours by themselves, without other inmates; a lockdown prevents interaction between the inmates so as to prevent altercations and other issues (Ex. B, Downey Aff., ¶ 6).

75) Plaintiff has sued Defendants Bukowski and Downey because they were the Warden and Chief of Operations at the Jerome Combs Detention Center; however, Plaintiff admitted that neither Bukowski or Downey were around for the altercation and could not have personally stopped the altercation and were not personally involved other than through their decisions on staffing (Ex. A, Pl.'s Dep., pp. 24, 164-166, 133-134, 171-172; Pl.'s Dep. Ex. 1, Pl.'s Interrogs., ¶ 14).

76) Plaintiff claims Defendants Bukowski and Downey failed to take adequate safety procedures after a shank was found in Max-A Pod on December 18, 2013 (Ex. A, Pl.'s Dep., pp. 39-42, 133-134).

77) Plaintiff further alleges that Sheriff Bukowski and Chief Downey are liable for alleged deficiencies in staff, procedure, manpower and operations, and that they failed these objectives; Plaintiff claims that it was a lack of manpower that caused this incident (Ex. A, Pl.'s Dep., pp. 164-166; Pl.'s Dep. Ex. 1, Pl.'s Interrogs., ¶ 14).

## **SUMMARY JUDGMENT STANDARDS**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The moving parties must show the lack of a genuine issue of material fact and must produce "more than a scintilla of evidence to support [their] position." *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669 (7th Cir. 2000); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When the evidence is not significantly

probative or is merely colorable, summary judgment is proper.  *Anderson*, 477 U.S. at 249-50.

"Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment."  *Id.* at 248.

**ARGUMENT**

**I.**    **DEFENDANTS BUKOWSKI AND DOWNEY WERE NOT PERSONALLY
INVOLVED IN ANY OF THE ALLEGED UNCONSTITUTIONAL ACTS OR
OMISSIONS AND, THEREFORE, CANNOT BE HELD LIABLE UNDER 42
U.S.C. § 1983**

In order to establish individual liability under § 1983, a plaintiff must show a causal

relationship between his alleged injuries and a defendant's alleged misconduct.  *Wolf-Lillie v.*

*Songquist*, 699 F.2d 864, 869 (7th Cir. 1983).  As such, a plaintiff must establish that each

defendant "caused or participated in the alleged constitutional deprivation."  *Id.*; *see also Gentry*

*v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).  Plaintiff Stevens cannot meet this burden with

regard to Defendants Downey or Bukowski.  Defendants Downey and Bukowski are sued in this

case merely by virtue of their respective positions as Sheriff and Chief of Corrections at the

Jerome Combs Detention Center (SOF, ¶ 75).  Plaintiff sued these two defendants in their

individual capacities, not under any *Monell* claim (SOF, ¶ 75).  Plaintiff seeks to hold Sheriff

Bukowski and Chief Downey liable for alleged deficiencies in staffing, procedure, and

manpower, which Plaintiff describes as officers failing to respond quickly enough to the

altercation or being in the wrong locations within the facility (SOF, ¶ 77).  However, it is

undisputed that neither Defendants Downey nor Bukowski were personally involved in any of

the unconstitutional acts or omissions alleged by Plaintiff in his Complaint, were not at the

altercation, and could not have personally stopped the altercation (SOF, ¶ 75).  *See Monell v.*

*Dep't of Social Services,* 436 U.S. 658, 690-94 (1978) (noting that "section 1983 does not

establish a system of vicarious responsibility" and, therefore, "public employees are responsible for their own misdeeds but not for anyone else's."). Further, Plaintiff has put forth zero evidence, nor conducted any discovery, that additional officers could have or would have stopped the altercation (one that Plaintiff voluntarily joined and participated in) faster. Plaintiff's allegations are purely self-made rhetoric.

Moreover, Plaintiff failed to draft a single grievance or request prior to the incident asking to be moved from Max-A pod because he felt he was in danger (SOF, ¶ 18). Additionally, the POD was placed on lockdown after a shank was found a week earlier to prevent any altercations between inmates, but Plaintiff voluntarily engaged in the fight by coming out of his cell (SOF, ¶¶ 11-12, 15-16, 73-74). Plaintiff's conclusory allegations that a lack of manpower at the jail allowed the incident to occur are insufficient to impose personal liability upon Defendants Bukowski and Downey with respect to Plaintiff's failure to protect claim. Accordingly, Defendants Downey and Kolitwenzew are entitled to summary judgment with regard to the individual capacity claims alleged against them.

## II.    PLAINTIFF'S FAILURE TO PROTECT CLAIM IS BARRED BY *HECK V. HUMPHREY*

In order for Plaintiff to prevail on his failure to protect claim, he would need to undermine the JCDC's finding---based on his own admission---that he was guilty in the incident on December 26, 2013, of voluntarily engaging and participating in a fight, for which he was ultimately disciplined with fifteen days in segregation (SOF, ¶¶ 11-12, 15-16). Plaintiff has failed to produce any evidence that this discipline was overturned or reversed. In *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), the Supreme Court held that a Section 1983 claim for damages that "would necessarily imply the invalidity of [a plaintiff's] conviction or sentence" is a not a cognizable claim.

This Court also analyzed this argument in *Grimaldo v. Stevenson, et al.* In *Grimaldo*, this Court held that "[w]hen an inmate claims to be the victim of an utterly unprovoked assault, his Section 1983 claim is barred by *Heck* unless and until the discipline committed [against him] is overturned, invalidated or vacated in some manner." *Grimaldo*, No. 12-2257-DGB at \*9; *see, also, Moore v. Mahone*, 652 F.3d 722, 725 (7th Cir. 2011); *Navejar v. Iyiola*, 718 F.3d 692, 697-698 (7th Cir. 2013) ("Navejar cannot deny that he disobeyed orders or assaulted Iyiola because those denials would 'necessarily imply' the invalidity of his discipline."); *Ibarra v. Bailey*, 2013 WL 6247430 \*5 (C.D. Ill. Dec. 2, 2013) ("Because prevailing on his assertion that he did nothing and was attacked by James would undermine the Adjustment Committee's finding that he was the attacker, his case is barred by *Heck*."). This Court held that the Kankakee County Department of Corrections' finding in *Grimaldo* that plaintiff's punishment, based at least partly on his plea of guilty to the charge of fighting, has never been overturned, entitled the defendants to summary judgment in their favor because plaintiff's failure to protect claim was barred by *Heck*.

Against that backdrop, Plaintiff's failure to protect claim is similarly barred by *Heck*. Plaintiff admitted that he was found guilty of violating JCDC policy 2.29 because he participated in a fight (SOF, ¶¶ 11-12, 15-16). He was disciplined with 15 days in segregation (SOF, ¶ 16). In addition, Plaintiff admitted during his deposition that he was guilty of fighting, and that he used derogatory words and voluntarily partake in the fight with inmate Johnson and violated JCDC disciplinary policy 2.29 (SOF, ¶¶ 11-12, 15-16). Most importantly, Plaintiff's 15 day segregation discipline has not been overturned or found invalid. Plaintiff's failure to protect claim is thus barred by *Heck*, and Defendants Bukowski and Downey are entitled to summary judgment in their favor.

III.    **DEFENDANTS BUKOWSKI AND DOWNEY ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY WERE NOT DELIBERATELY INDIFFERENT TO A SERIOUS RISK OF HARM FACED BY PLAINTIFF**

"The Due Process Clause of the Fourteenth Amendment protects pre-trial detainees from punishment and places a duty upon jail officials to protect pre-trial detainees from violence." *Fisher v. Lovejoy*, 414 F.3d 659, 661 (7th Cir. 2005). However, to succeed on a failure to protect claim, Plaintiff must show that Defendants were deliberately indifferent to Plaintiff's safety needs. *Grievson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008). "Demonstrating deliberate indifference towards a prisoner's safety needs requires a showing that the inmate was 'incarcerated under conditions posing a serious risk of harm,' and a showing that individual prison officials had subjective knowledge of the risk of harm, which they personally disregarded." *Id.* (*quoting Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The plaintiff must show that the defendant had "something approaching total unconcern for [the plaintiff's] welfare in the face of serious risks," *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992) (*citing McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991)), or a "conscious, culpable refusal to prevent harm." *Id.* (*citing Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985)).

The first prong of a failure to protect claim—considered the objective prong—requires a plaintiff to show that "he is incarcerated under conditions posing a substantial risk of harm." *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005). To satisfy this prong, a plaintiff must demonstrate not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that serious harm might actually occur. *Id.* at 910-11.

"An inmate cannot base a failure to protect claim on a situation that he instigated." *Harris v. Schapmire,* 2010 WL2697146, *4 (C.D. Ill. July 7, 2010); *citing Clark v. Johnson*, 181 F. App'x 606, 607-608 (7th Cir. 2006). In *Clark*, an inmate wrote several requests and

grievances asking to be transferred from the unit because he was receiving insults and threats from other inmates. *Id.* The institution failed to transfer him, and after several verbal altercations, the plaintiff threw a book at his roommate, who in turn grabbed the plaintiff and pulled him off the bed, breaking his arm. *Id.* The district court held that the plaintiff could not blame the defendants under a theory of failure to protect for a fight he started. *Id.* The Seventh Circuit Court of Appeals ("Seventh Circuit") upheld the district court and reasoned: "Clark is under the misapprehension that his behavior is justified because his cellmate verbally 'provoked' him. But the risk to Clark was of his own making, and prison officials cannot reasonably be required to protect an inmate who intentionally instigates a violent altercation with another prisoner. Clark's violent conduct was not beyond his control . . . " *Id.* at 607.

Further, "[p]rison officials cannot be held liable for problems directly caused by the plaintiff's own contentious nature." *Hadley v. Peters*, 841 F. Supp. 850, 858(C.D. Ill. 1994). In *Hadley*, the plaintiff was involved in an altercation with another inmate in which the plaintiff told the other inmate that he was a "bum." *Id.* The plaintiff was attacked by the inmate and required hospitalization. *Id.* The court held that the plaintiff's failure to protect claim was without merit. *Id.* The plaintiff argued that the defendants had constructive notice that he might be in danger because plaintiff's history indicated that he had a history of fighting and disruption with every cellmate he had ever had. *Id.* The court stated that "[w]hile inmates are entitled to reasonable protection from harm, prison officials cannot be expected to eliminate the possibility of all attacks. The prison setting is potentially dangerous and sometimes explosive. Violence is unfortunately endemic in American prisons. The defendants cannot be held liable for their inability to prevent the unexpected eruption described here, particularly since the plaintiff appears to be the instigator of the altercation." *Id.* at 858. The court continued that "liability

requires actual notice of impending harm, or total unconcern for an inmate's welfare, coupled with a pervasive risk of violence." *Id*. at 858. Finally, the court held: "[t]he court, furthermore, is compelled to observe that the plaintiff himself bears the brunt of the responsibility if he is unable to live peaceably with any of his cellmates. Prison officials cannot be held liable for problems directly caused by the plaintiff's own contentious nature." *Id*. at 858.

Against that backdrop, it was Plaintiff here who charged through the causation wall by engaging into confrontational words with inmate Johnson and then voluntarily engaging in a fight with inmate Johnson because he did not want to appear weak to the other inmates (SOF, ¶¶ 11-12, 15-16). It is here where Plaintiff's claim is fatally undermined by his own admissions. Indeed, "a plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts . . . and admissions can of course admit the admitter to the exit of the federal courthouse." *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997); *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995). Plaintiff's own actions in voluntarily participating in a fight so as not to look weak caused his injuries, not any failure on the part of the Defendant Bukowski or Downey. Similarly to *Hadley* and *Clark*, although Plaintiff did not start the fight necessarily, he had a verbal altercation with inmate Johnson, and then voluntarily participated in a physical altercation with inmate Johnson. Identically to *Clark*, the risk to Plaintiff was of his own making and "prison officials cannot reasonably be required to protect an inmate who intentionally instigates a violent altercation with another prisoner." *Clark*, 101 F. App'x at 607-608. Plaintiff's violent conduct in entering into the fight was not beyond his control and had Plaintiff not engaged in the fight, he would not have been injured in the altercation. Further, no evidence exists tending to show that Plaintiff was at a substantial risk of harm before the physical altercation occurred. Prior to the physical

altercation, Plaintiff did not have problems or physical altercations with other detainees, including inmates Johnson or Moore; nor did he request to be transferred or ever feel threatened (SOF, ¶¶ 17-20).

The second prong of a failure to protect claim—considered the subjective prong—has two subparts, and it requires a plaintiff to show that a defendant (1) had knowledge of the substantial risk of harm, and (2) disregarded that risk. *Golden*, 2009 WL 971416, at *3 (*citing Brown*, 398 F.3d at 913, 916). The defendant "must both be aware of the facts from which an inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 838. "The relevant inquiry is whether correctional officials actually knew about the danger that the plaintiff faced, not whether a reasonable official should have known." *Golden*, 2009 WL 971416, at *3 (*citing Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999). "Awareness of a specific, impending and substantial threat to the plaintiff's safety is necessary to support a failure to protect claim." *Cirilla v. Kankakee County Jail*, 438 F. Supp. 2d 937, 944 (N.D. Ill. 2006) (*citing Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996)). As explained at length above, Defendants here did not have knowledge of a substantial risk of harm. Plaintiff failed to inform any of the Defendants of any specific threat to his safety (SOF, ¶¶ 17-20).

Nor did Defendants Bukowski or Downey ignore a threat to Plaintiff's safety. Sheriff Bukowski and Chief Downey took reasonable steps in placing the entire Pod on lockdown after a shank was found on December 18, 2016 (SOF, ¶¶ 72-73). The lockdown was done to eliminate any potential altercations or incidents between inmates (SOF, ¶¶ 72-73). However, there was absolutely no known threat to any inmates. The court in *Hadley* reasoned that the defendants cannot be expected to prevent the unexpected eruption described, particularly since the plaintiff instigated and fully participated in the altercation. Likewise, as shown above, the Defendants

had properly minimized the potential harm of the shank, and liability requires actual notice of impending harm, or total unconcern for an inmate's welfare, coupled with a pervasive risk of violence. Defendants here simply had no notice of an impending harm to Plaintiff or any other inmate.

JCDC policy does not allow correctional officers to physically interject into a fight between inmates until they can outnumber the inmates. They are also to wait for a Taser if one is available, which are kept in booking. Plaintiff admitted that Officer Tutt called "10-10" over the radio, indicating a fight in progress (SOF, ¶¶ 24-28). Officer Tutt also informed inmate Moore, prior to him engaging in the fight, to shut his cell door and for all the inmates in the pod to stay in their cells, but Moore refused and instead walked down the stairs towards the altercation between inmate Johnson and Plaintiff (SOF, ¶ 32). However, upon Officer Garcia responding to the fight, Officer Tutt, Moliga, and Garcia ran into the Pod to ensure the safety of the inmates and institution, even without a Taser, just a minute after the fight commenced. Those officers risked their own safety to prevent further injury to any inmate. Sgt. Ball came a minute later with the Taser. It is obvious that the JCDC was clearly and sufficiently staffed to stop an altercation between inmates in a reasonable time and did so in this instance. Even further, it is clear that the institution responded reasonably to the altercation, and did not disregard any risk to Plaintiff.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY WERE NOT DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS MEDICAL NEEDS

The Eighth Amendment protects prisoners from deliberate indifference to a substantial risk of serious injury or medical need. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). This protection is extended to pretrial detainees under the Due Process Clause of the Fourteenth

Amendment.  *See Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (*citing Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000)).  To prevail, a plaintiff must satisfy two elements, "namely that (1) an objectively serious injury or medical need was deprived; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it."  *See Chapman*, 241 F.3d at 845 (*citing Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999)).

An objectively serious injury or medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *see Chapman*, 241 F.3d at 845; *Zentmyer*, 220 F.3d at 810, and is one where "failure to treat it could result in further significant injury or unnecessary and wanton infliction of pain." *Moralis v. Flageole*, No. 06 C 2034, 2007 WL 2893652, *14 (C.D. Ill. Sept. 28, 2007) (*quoting Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999)).  Certain conditions, such as mild pain and non-life threatening rashes, do not rise to the level of objectively serious.  *See, e.g., Gibson v. Ramsey*, No. 99 C 5315, 2004 WL 407025, *7 (N.D. Ill. Jan. 29, 2004) ("[w]aking up with back pain [and] taking Tylenol to relieve the pain, does not state a serious medical condition"); *Ray v. Cherrian*, No. 10 C 4066, 2010 WL 2696119, * 2 (N.D. Ill. July 2, 2010) (finding that a fungal rash was not objectively serious because it "is not so serious that it is life threatening or poses a risk of needless pain or lingering disability"); *Holms v. Sheahan*, 930 F.3d 1196, 1201-02 (7th Cir. 1991) (inmate who was forced to wait eight months for medication for a painful skin condition did not have a Section 1983 claim).

Under the second element, a plaintiff must show "that the official was aware of the risk and consciously disregarded it nonetheless."  *Farmer v. Brennan*, 511 U.S. 825, 840-42 (1994).

This element requires more than negligence or even gross negligence for liability.  *Chapman*, 241 F.3d at 845 ("Liability attaches only if the conduct is intentional or criminally reckless."). The plaintiff must show that the jail official either wanted harm to come to the inmate or must have been completely unconcerned about the inmate's welfare in the face of substantial medical harm.  *See McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  The Seventh Circuit has noted that the standard is a "high hurdle . . . because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'"  *Rosario v. Brawn*, 670 F.3d 821, 822 (7th Cir. 2012).

This Court must further examine the totality of an inmate's medical care when considering whether that care "evidences deliberate indifference to his serious medical needs." *Gutierrez*, 111 F.3d at 1375; *citing DeMallory v. Cullen*, 855 F.2d 442, 445 (7th Cir. 1988). Moreover, non-medical professionals, such as the Defendants, are entitled to reasonably rely on the medical opinions and evaluations of certified health care providers such as the medical department.  *See Greeno v. Daley*, 414 F.3d 645, 655-656 (7th Cir. 2005) (finding that a non-medical defendant may be deliberately indifferent if they ignore an inmate's complaint entirely, but no deliberate indifference where defendant investigated the complaints and properly referred them to medical providers who are expected to address the inmate's issues).  "Prison administrators, having no medical expertise, must rely on health care professionals to assess the needs of prisoners and initiate treatment."  *Williams v. Cearlock*, 993 F. Supp. 1992, 1997 (C.D. Ill. 1998) (holding that inmate's Section 1983 claim that prison did not provide effective medical care did not extend to administration who did not have direct responsibility for medical care).

This Court should first look to whether Plaintiff's claims are *de minimis*.  Plaintiff's allegation that he was delayed medical treatment for two hours by the officers after the incident is *de minimis* and cannot possibly survive summary judgment.  *See Ingraham v. Wright*, 430 U.S. 651, 674 (1977) (there is a "*de minimis* level of imposition with which the Constitution is not concerned").  A short delay in receiving medical treatment, even if it results in serious injury to an inmate, does not rise to the level of deliberate indifference.  *See*, *e.g.*, *Martin v. Tyson*, 845 F.2d 1451, 1457–1458 n.4 (7th Cir. 1988) (five-month delay in treating a prisoner's broken tooth does not rise to the level of deliberate indifference); *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987) (no deliberate indifference where prison staff delayed four months before providing a paraplegic prisoner with necessary medical supplies even though the delay caused an ulcer on the prisoner's buttock and ultimately loss of some bone in that buttock).  Moreover, short delays in receiving pain medication do not rise to the level of deliberate indifference.  In *Kyser v. Rednow*, No. 10-990-GPM, 2011WL 221829, *2 (S.D. Ill. Jan. 23, 2011), the Court held that the over three-week delay between when the prisoner complained of back pain and when he began receiving pain medication was *de minimis* and did not state an Eighth Amendment claim.

Courts throughout the Seventh Circuit have found that plaintiffs have failed to establish deliberate indifference claims upon alleging *de minimis* delays in receiving treatment.  *See, e.g., Cox v. Hartshorn*, 503 F. Supp. 2d 1078, 1087 (C.D. Ill. 2007) (plaintiff was delayed medical treatment for five weeks after drafting multiple sick call requests and verbally requesting medical attention for his red, bumpy, bloody and circular rash on his foot; however, the court deemed the short delay in providing him medical attention is not evidence of defendants' deliberate indifference).

Against that backdrop, the medical treatment provided to Plaintiff was more than adequate, and Plaintiff's claims are *de minimis*. Plaintiff was transferred to Max-C after the altercation at approximately 6:00 a.m. (SOF, ¶ 49). The fight ended, according to the security video, around 5:47 a.m. (SOF, ¶ 49). The pass-on book stated Plaintiff asked for medical attention at 6:50 a.m.; however, for the sake of summary judgment, Plaintiff claims he asked for medical attention immediately after the fight, or approximately 5:50 a.m. to 6:00 a.m. (SOF, ¶¶ 51-57). Plaintiff was transferred by Officers Tutt and Moliga, but claims that Officers Moliga, Garcia, and Tutt, as well as Sergeants Schloendorf and Sgt. Ball, saw his condition, i.e. bleeding from his mouth area (SOF, ¶¶ 53-57, 69). Plaintiff admits, however, that he only asked Officers Moliga and Tutt for medical attention and did not ask Sgt. Schloendorf, Sgt. Ball or Officer Garcia for medical attention (SOF, ¶¶ 54-55). Regardless, a medical first responder, Officer Manuel Villafuerte, came to see Plaintiff at 7:00 a.m. (SOF, ¶¶ 57-58). First Responders are members of the correctional staff who can immediately medically treat and assess an inmate and decide whether the inmate needs immediate emergency medical attention, or whether the inmate can see a nurse or physician assistant upon the medical staff coming on duty (SOF, ¶ 58). Officer Villafuerte saw Plaintiff's injuries and informed Plaintiff he would get the nurse (SOF, ¶ 60). Ten minutes later, Nurse Charee Sangster came and evaluated Plaintiff and informed the correctional staff that he needed to go to the hospital (SOF, ¶¶ 61-63). He was then sent to the hospital and according to hospital records, arrived at the emergency room of Presence St. Mary's Hospital at 7:52 a.m. (SOF, ¶¶ 64-67). Plaintiff was then treated at Presence St. Mary's and received pain medication (SOF, ¶¶ 64-67).

Against that backdrop, Plaintiff is claiming deliberate indifference based on this alleged two hour delay in getting to the hospital (SOF, ¶¶ 69-71). In reality, it is at the maximum, a one

hour delay in Plaintiff asking for medical attention, approximately 5:50 a.m. to 6:00 a.m., to first responder Officer Villafuerte and Nurse Charee Sangster evaluating Plaintiff and sending him to the hospital, 7:00 a.m. to 7:10 a.m. (SOF, ¶¶ 50-64).  Plaintiff then arrived at the hospital at 7:52 a.m.  Plaintiff's claim is clearly *de minimis* as the Defendants provided Plaintiff with medical treatment by having both a first responder and nurse come and see Plaintiff approximately one hour after the incident.

In conclusion, Plaintiff has failed to show that the correctional officers or sergeants ignored Plaintiff's complaints or that their actions were "a substantial departure from accepted professional judgment," criminally reckless, grossly negligent, or even negligent.  Therefore, his claim that Defendants were deliberately indifferent to his serious medical needs cannot survive Defendants' Motion for Summary Judgment.

## V.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity shields liability for officials who perform discretionary functions in the course of duty to the extent that their conduct does not violate clearly established rights of which a reasonable person would have known.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999).  It is intended to "provide government officials with the ability to 'reasonably anticipate when their conduct may give rise to liability for damages.'"  *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (*quoting Davis v. Scherer*, 468 U.S. 183, 195 (1984)).  Plaintiff bears the burden of showing that (1) his rights were violated; and (2) the constitutional right allegedly violated was clearly established at the time of the challenged conduct.  *See*, *e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  A plaintiff can "demonstrate that the right was clearly established by presenting a closely analogous case that establishes that the defendants' conduct was unconstitutional or by

presenting evidence that the defendants' conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from the court." *Estate of Escobedo v. Bender*, 600 F.3d 770, 779-780 (7th Cir. 2010).

As discussed throughout this brief, Plaintiff has failed to demonstrate that Defendants violated any clearly established constitutional rights. There is not a closely analogous case on any of Plaintiff's claims that would have provided Defendants fair warning that their conduct amounted to a constitutional violation. In fact, the cases, as cited above on each of Plaintiff's alleged claims, state the opposite. Accordingly, Defendants are entitled to qualified immunity, and summary judgment should be granted in their favor on Plaintiff's claims.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Honorable Court grant their motion for summary judgment and enter judgment in their favor and against Plaintiff.

Respectfully submitted,

**s/Michael W. Condon**
MICHAEL CONDON, Atty. Bar No. 06192071
ANTHONY BECKNEK, Atty. Bar No. 06305451
*Attorneys for Defendants*
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
P: 630-773-4774      F: 630-773-4851
mcondon@hcbattorneys.com
abecknek@hcbattorneys.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| DeERIC M. STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  15-cv-2177 |
| | ) | |
| v. | ) | Judge Sue E. Myerscough |
| | ) | Magistrate Judge Tom Schanzle-Haskins |
| TIMOTHY F. BUKOWSKI, et al., | ) | |
| | ) | **JURY DEMAND** |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2016, I electronically filed the foregoing ***Defendants' Motion for Summary Judgment and Memorandum In Support*** with the Clerk of the U.S. District Court for the Central District of Illinois, Urbana Division, using the CM/ECF system, which will send notification to the CM/ECF participants; and I hereby certify that I have mailed with the United States Postal Service the aforementioned document to the following non-CM/ECF participant by U.S. Certified Mail:

**TO:**    Mr. DeEric M. Stevens – 45815-424
Metropolitan Correctional Center
Inmate Legal Mail/Parcels
71 W. Van Buren
Chicago, IL 60605
*Pro Se Plaintiff*

by depositing a copy of same in the U.S. Mail at 333 Pierce Road, Itasca, Illinois on July 15, 2016, with the proper postage prepaid.

**s/Michael W. Condon**
MICHAEL CONDON, Atty. Bar No. 06192071
ANTHONY BECKNEK, Atty. Bar No. 06305451
*Attorneys for Defendants*
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
P:  630-773-4774    F:  630-773-4851
mcondon@hcbattorneys.com
abecknek@hcbattorneys.com
