UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| DEERIC M. STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 15-2177 |
| | ) | |
| TIMOTHY F. BUKOWSKI, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## SUMMARY JUDGMENT OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

Plaintiff, proceeding pro se and presently incarcerated at Jerome Combs Detention Center in Kankakee, Illinois, brought the present lawsuit pursuant to 42 U.S.C. § 1983 alleging Fourteenth Amendment claims for failure to protect and deliberate indifference to a serious medical need. The matter comes before this Court for ruling on the parties' respective Motions for Summary Judgment. (Docs. 22, 28).

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in his favor.  Ogden v. Atterholt, 606 F.3d 355, 358 (7th Cir. 2010).  The party moving for summary judgment must show the lack of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## FACTS

Plaintiff was incarcerated at Jerome Combs Detention Center ("JCDC") in Kankakee, Illinois as a pretrial detainee.  Defendants are employed at the facility in the following capacities:  Defendant Bukowski was the Sheriff; Defendant Downey was the Chief of Corrections; Defendants Schloendorf and Ball were correctional sergeants; and Defendants Tutt, Moliga, and Garcia were correctional officers.

On December 18, 2013, JCDC officials discovered a homemade shank in the shower stall of Plaintiff's housing pod (known as "Max-A"). For at least the next eight (8) days, a lockdown ensued. On December 24, 2013, Plaintiff got into a fight with two other inmates and suffered a broken jaw. No weapons were used. Plaintiff testified that, prior to the fight, he did not know the fight was going to happen, he did not fear the inmates with whom he fought, and he did not file any requests or grievances alerting officials to any specific threat of harm. UMF 19-20. Plaintiff had no prior arguments with the other inmates. UMF 18. Plaintiff also described his prior interactions with one of the inmates as "friendly." Pl.'s Dep. 53:21-24.

When the fight occurred, Defendant Tutt was assigned to Max-A, and Defendant Garcia was assigned to E-Pod. They were each responsible for supervising the inmates and conducting security checks within their assigned pods. (Doc. 28-4 at 1-2). Defendant Moliga was assigned as a "rover" responsible for transporting inmates and assisting in the various pods when circumstances so required. Defendant Ball was assigned to booking. *Id.*

Plaintiff left his cell at approximately 5:38 a.m. UMF 10. In his deposition, Plaintiff conceded the accuracy of a portion of Defendant Moliga's incident report describing the events that transpired immediately before the altercation ensued. Pl.'s Dep. 86:19-87:18. The incident report reads as follows: "At approximately [5:35 a.m.,] I noticed a detainee in Max walk down from the top tier. I then noticed a detainee in cell 2 open his door and step outside. Both began talking and got into fighting positions." (Doc. 28-3 at 24). Plaintiff was the detainee in cell 2. Pl.'s Dep. 51:16-18.

The fight commenced. Defendant Tutt called an emergency ("10-10") over the radio and locked down the pod. A third inmate refused to close his door, went down the stairs, and joined the fight. When Defendant Garcia arrived at the pod, he, along with Defendants Tutt and Moliga, entered the pod to stop the fight despite a JCDC policy that required them to wait.[1] Plaintiff and the

---

[1] According to Defendant Downey: "It is JCDC policy that if there is an inmate altercation, correctional officers must wait for back-up officers to outnumber the inmates involved in the altercation before using physical tactics to interject themselves into the altercation, and preferably must wait for a taser if one is available in order to protect the officers, inmates, and the institution." (Doc. 28-4 at 2, ¶ 10).

two other inmates complied with verbal commands to stop fighting. The fight lasted approximately 1 minute and 15 seconds.  UMF 44.

Defendants submitted a video of the incident.  The video shows Plaintiff and another inmate fighting at approximately 5:39 a.m.  The two separated briefly, and the third inmate joined the fight shortly thereafter.  Defendants are seen inside the pod at approximately 5:40 a.m.  Plaintiff testified that the other inmate started the fight, but that he later admitted his involvement and received 15 days in segregation.  Pl.'s Dep. 60:7-11; (Doc. 28-3 at 19).

After the fight, Plaintiff requested medical care.  The parties do not dispute that Plaintiff received medical treatment at JCDC and at an outside hospital.  Plaintiff, however, disputes the timing of the treatment as indicated in JCDC logs and the hospital records.  The parties do not dispute that Plaintiff was admitted to the hospital at 10:23 a.m., following a CT scan, x-rays, and physician's examination.[2]  Plaintiff had surgery on his jaw a day later.

---

[2] Plaintiff argues in his response that the records from St. Mary's Hospital are illegible.  (Doc. 36 at 10, ¶ 66).  The Court acknowledges that the printout is of poor quality as it relates to Plaintiff's time of arrival, but the handwritten notation in the lower left-hand corner indicating that Plaintiff was admitted at "1023" is clear.  (Doc. 28-3 at 10).

## ANALYSIS

## Heck v. Humphrey

Defendants argue that Plaintiff's claims are barred pursuant to Heck v. Humphrey, 512 U.S. 477 (1994). Heck holds that a claim for damages under §1983 is not cognizable when a successful claim would necessarily imply the invalidity of a conviction or sentence that has not previously been terminated in the inmate's favor. Id. at 486-87. Heck's favorable termination requirement "is necessary to prevent inmates from doing indirectly through damages actions what they could not do directly by seeking injunctive relief— challenge the fact or duration of their confinement without complying with the procedural limitations of the federal habeas statute." Nelson v. Campbell, 541 U.S. 637, 647 (2004). If an inmate challenges the results of a prison disciplinary hearing, Heck applies if the result of that hearing affects the duration of the inmate's confinement (i.e. the revocation of good time credits). Edwards v. Balisok, 520 U.S. 641, 644-48 (1997).

Plaintiff received 15 days in segregation as a result of the fight. The record does not disclose, nor do Defendants argue, that the discipline received affected the duration of Plaintiff's confinement,

or that it resulted in additional convictions that have not yet been overturned.

Instead, Plaintiff's claims concern actions that occurred prior to, and after, the fight in question: first, that jail officials housed him under conditions that posed a substantial threat of harm to his personal safety; and, next, that they failed to provide adequate medical care for his resulting injuries. These claims are properly characterized as challenges to the conditions of confinement. See Wilson v. Seiter, 501 U.S. 294, 303 (1991) ("[M]edical care a prisoner receives is just as much a 'condition' of his confinement as ...the protection he is afforded against other inmates."). Where an inmate challenges only the conditions of his confinement, Heck does not apply. See Muhammad v. Close, 540 U.S. 749, 754-55 (2004).

### Defendants Bukowski and Downey

Defendants Bukowski and Downey were the Sheriff and Chief of Corrections, respectively. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." Vance v. Peters, 97

F.3d 987, 991 (7th Cir. 1996) (citations omitted).  A government official may not be held liable under § 1983 on a theory of respondeat superior, that is, for the unconstitutional acts of his or her subordinates.   Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  To be held liable, a government supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye...."  Vance, 97 F.3d at 993 (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)).

Plaintiff argues that these Defendants were responsible for inadequate staffing, manpower, and supervision.  Defendants Bukowski and Downey were not the jail officials who responded to the fight on December 26, 2013, nor does the record suggest that they were involved in Plaintiff's medical treatment or transport to the hospital.

The only information that would have been readily available to them prior to the December 26, 2013 fight is that a shank had been found in Plaintiff's housing pod, and the pod had been locked down for eight (8) days, presumably without incident.  By Plaintiff's own admission, no JCDC official was notified of a problem between Plaintiff and the other two inmates involved in the fight.

Therefore, the Court finds that no reasonable juror could conclude that Defendants Bukowski and Downey violated Plaintiff's constitutional rights.

### Failure to Protect

Plaintiff was a pretrial detainee at the time of these events. His rights therefore arise under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's proscription against cruel and unusual punishment.  See Burton v. Downey, 805 F.3d 776, 784 (7th Cir. 2015) (citing Pittman v. Cnty. of Madison, 746 F.3d 766, 775 (7th Cir. 2014)).  The standards under the respective amendments are essentially the same.  Id. (citing Smego v. Mitchell, 723 F.3d 752, 756 (7th Cir. 2013)).

To succeed on a failure to protect claim, a plaintiff must show (1) "that he is incarcerated under conditions posing a substantial risk of serious harm," and, (2) prison officials acted with "deliberate indifference" to that risk.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  For purposes of satisfying the first prong, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an

excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Id. at 843.

A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. A plaintiff "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." Pope v. Shafer, 86 F.3d 90, 92 (7th Cir. 1996) (quoting McGill v. Duckworth, 944 F.3d 344, 349 (7th Cir. 1991)). Liability attaches where "deliberate indifference by prison officials effectively condones the attack by allowing it to happen...." Haley v. Gross, 86 F.3d 630, 640 (7th Cir. 1996).

Nobody, including Plaintiff, knew that the December 26, 2013 fight was going to happen, nor could JCDC officials ascertain that a substantial risk of harm existed as it related to Plaintiff. Plaintiff did not file any requests or grievances stating as much, and an inference that a homemade shank found in the pod would result in the type of altercation that occurred is tenuous at best. In fact,

putting the pod on lockdown and confiscating the shank were reasonable steps to reduce the risk that the shank's owner would act on any animus towards another inmate.

As for the fight, guards are not required to take unreasonable risks in an attempt to break up a fight between inmates "when the circumstances make it clear that such action would put [the guard] in significant jeopardy." Guzman v. Sheahan, 495 F.3d 852, 858 (7th Cir. 2007). Once the fight started Defendant Tutt immediately called for backup and attempted to lock the cells of the other inmates in the pod. When the third inmate prevented his door from closing and remained able to move about the pod, Defendants Tutt and Moliga would have been outnumbered had they attempted to break up the fight at that time.

The video discloses that Plaintiff and the first inmate separated only for a few seconds before the third person joined the fight and, thus, no opportunity to separate the two arose. Waiting for Defendant Garcia's arrival to at least ensure an equal number of guards to inmates was not an unreasonable step in response to the events that transpired. Despite the delay, Defendants were able to stop the fight after 1 minute and 15 seconds.

Therefore, the Court finds that no reasonable juror could conclude that Defendants violated Plaintiff's constitutional rights.

## Medical Care

Inmates are entitled to adequate medical care under the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). To prevail, a plaintiff must show that the prison official acted with deliberate indifference to a serious medical need.  Estelle, 429 U.S. at 105.  Claims of negligence, medical malpractice, or disagreement with a prescribed course of treatment are not sufficient.  McDonald v. Hardy, 821 F.3d 882, 888 (7th Cir. 2016) (citing Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014), and Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008)).

Plaintiff argues that Defendants unnecessarily delayed his access to medical treatment by ignoring the requests he made while he was housed in a segregation cell after the fight.  Plaintiff contends that he made these requests immediately, while the JCDC logs indicate that Plaintiff did not request medical treatment until approximately one (1) hour after the fight.  Compare (Doc. 28-3 at 1) (Plaintiff requested medical treatment at 6:50 a.m.), and (Doc. 28-3 at 3) ("[Plaintiff] stated that he was not sure if he need[ed]

medical help" after the fight), with Pl.'s Dep. 128:19-129:1 (Plaintiff requested medical treatment immediately after the fight).

Where delay in receiving medical treatment is at issue, a plaintiff must offer "verifying medical evidence" that the delay, rather than the underlying condition, caused some degree of harm. Williams v. Liefer, 491 F.3d 710, 714-15 (7th Cir. 2007); Jackson v. Pollion, 733 F.3d 786, 790 (7th Cir. 2013) ("No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury."). "That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." Williams, 491 F.3d at 715.

The Court can define a four-to-five hour window beginning from the time the fight ended until Plaintiff was admitted to the hospital. During that time, JCDC medical professionals examined Plaintiff, Plaintiff was transported to the hospital, examined, x-rayed, and had a CT scan taken. The only reasonable inference from these facts is that Plaintiff arrived at the hospital in enough

time to complete the necessary diagnostic testing before he was admitted for surgery, though Plaintiff disputes the 7:52 a.m. arrival timestamp indicated on the medical records.

The difference between the parties' respective timelines is approximately one (1) hour. Assuming Plaintiff made the requests for treatment immediately after the fight as he testified, and JCDC medical staff responded promptly, Plaintiff would have presumably been admitted to the hospital one hour earlier. The record, however, does not support a reasonable inference that any delay on December 26, 2013 exacerbated Plaintiff's condition as Plaintiff's surgery did not occur until the next day.

Finally, short delays in receiving medical treatment, standing alone, are not sufficient to show deliberate indifference. See Burton, 805 F.3d at 785 (two-day delay, on its own, is not sufficient to show a constitutional violation). Therefore, the Court finds that no reasonable juror could conclude that the Defendants were deliberately indifferent.

### Plaintiff's Motions

Plaintiff filed a Motion (Doc. 46) requesting appointment of an expert to review the video evidence in this case. Plaintiff alleges

that his copy of the video has been altered in an attempt to characterize him as the aggressor in the fight. Plaintiff states this is relevant to Defendants' argument that <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994) bars his claims. As discussed above, <u>Heck</u> does not bar Plaintiff's claims. Therefore, Plaintiff's motion (Doc. 46) is denied.

Plaintiff also filed a Motion for Summary Judgment (Doc. 22). In addressing the motion, the Court is required to view the facts in the light most favorable to the Defendants. Because Plaintiff cannot prevail even when the facts are construed in his favor, Plaintiff's motion is denied. Accordingly, Plaintiff's Motion (Doc. 27) requesting a ruling on his Motion for Summary Judgment is denied as moot.

**IT IS THEREFORE ORDERED:**

1) **Plaintiff's Motion for Summary Judgment [22] and Motions [27][46] are DENIED for the reasons stated above.**

2) **Defendants' Motion for Summary Judgment [28] is GRANTED. The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff. All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs. Plaintiff remains responsible for the $350.00 filing fee.**

3) **If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for**

**leave to appeal in forma pauperis MUST identify the issues the Plaintiff will present on appeal to assist the court in determining whether the appeal is taken in good faith. See Fed. R. App. P. 24(a)(1)(c); see also Celske v Edwards, 164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); Walker v. O'Brien, 216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose...has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.**

ENTERED:     March 20, 2017.

FOR THE COURT:


_____*s/Sue E. Myerscough*_____
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE